UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CLINTON JAY THORN

      Plaintiff,

                                      Case No. 1:07-cv-155

v

                                      Hon. Wendell A. Miles

NORTHSIDE HOSPITAL and
PRINCIPAL LIFE INSURANCE COMPANY,

      Defendants.

_____/


## OPINION AND ORDER ON DEFENDANT PRINCIPAL LIFE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT


      Plaintiff Clinton Jay Thorn originally filed this action *pro se*, asserting claims against his former employer, Northside Hospital ("Northside" or "the hospital"), under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* and its amendments contained within the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. § 1161 *et seq.*  Plaintiff later filed an amended *pro se* complaint virtually identical in all respects to the original complaint, with the exception of adding Principal Life Insurance Company ("Principal") as a second defendant.  Plaintiff alleges that his claims arise from "the denial of health insurance continuation and denial of plan information" regarding health and life insurance benefits.  Amended Complaint at 2, ¶ 3.

      The matter is currently before the court on a motion by Principal for summary judgment

(docket no. 27).  Plaintiff, who is now represented by counsel, has opposed the motion.[1]   For the

reasons to follow, the court grants the motion.


**I**

Between October 25, 2004 and May 13, 2005, plaintiff was employed as an admissions

supervisor at Northside, which is located in Atlanta, Georgia.  Plaintiff voluntarily left his

position, presumably on good terms, after giving appropriate notice.  By the time he filed this

action, plaintiff was living in Lansing, Michigan.

Northside established self-funded welfare benefit plans subject to ERISA, including both

health and life insurance coverage for its employees.  Northside's health insurance plan, known

as the "Member and Dependent Medical Expense Coverage" Plan ("the Medical Plan"), in place

during the time of plaintiff's employment with the hospital, was funded by contributions from

the hospital and its employees.  Defendant's Exhibit (doc. no. 28-2) at 21.[2]  Northside was

named as "plan administrator" and "primary fiduciary" in the applicable plan document, dated

February 1, 2005.  Id. at 9, 21.

Part II, Section A, Article 2 of the Medical Plan, titled "Plan Administrator," provided as

follows:

---

[1]Northside has filed its own motion for summary judgment (doc. no. 39), which remains
pending.  The court will resolve that motion in a separate decision to follow.

[2]Although Principal cites to its exhibits by alphabetic reference (i.e., A, B, C, etc.), its
exhibits appear to be out of order.  For ease of reference, the court will cite to electronic docket
numbers for Principal's exhibits, and (where appropriate) to electronic page numbers for internal
page numbers for these exhibits.

The Company will be the primary fiduciary with respect to the operation and administration of this Plan and will be the Plan Administrator.  The Company may employ any individual, individuals, or entity to provide administrative services to the Plan and assist in the administration of the Plan.

The Company, as plan administrator within the meaning of ERISA, has complete discretion to construe or interpret the provisions of this Plan, to determine eligibility for benefits from this Plan, and to determine the type and extent of benefits, if any, to be provided by this Plan.  The Company's decisions in such matters shall be controlling, binding, and final.  In any action to review any such decision by the Company, the Company shall be deemed to have exercised its discretion properly unless it is proved duly that the Company has acted arbitrarily and capriciously.

Id. at 21.  Part II, Section A, Article 3 of the Medical Plan, titled "Information to be Furnished,"

further provided as follows:

The Company will be responsible for sending Members' applications and claim forms to the firm contracted to administer the Plan for the Plan Administrator.  The Company will also be responsible for notifying such firm of any changes with respect to Members and Dependents eligible for coverage and other facts necessary for determining their coverage and for administering the Plan.

Id.  The "Company" refers to Northside.[3]

Part III, Section D, Article 3 of the Medical Plan, titled "Federal Required Continuation,"

contains a subsection titled, "Consolidated Omnibus Budget Reconciliation Act ('COBRA')."

Id. at 31.  The Medical Plan explains that COBRA requires that "qualified persons," as defined

in the Medical Plan, be allowed "to continue group health coverage after it would normally end."

Id.  Subparagraph A of this section of the Medical Plan, titled, "Qualified Person/Qualifying

---

[3]The definitions portion of the Medical Plan document defines "Company" as "[t]he business firm, union, trustee(s), or other entity for which this plan document is established (see Title Page)."  The title page of the document bears the heading "Northside Hospital, Inc. (called the Company in this plan document)."  Defendant's Exhibit 1 (doc. no. 28-2) at 2, 7.

3

Events," provided in pertinent part as follows:

> Continuation of group health coverage must be offered to:
>
> (1)     A Member (and any covered Dependents) following:
>
>     (a)    termination of employment for a reason other than gross misconduct; or
>
>     (b)    a reduction in work hours.
>
> \* \* \*
>
> Note: Persons who, after the date of COBRA continuation election, become entitled to Medicare or become covered under another group health plan and have satisfied the preexisting exclusion provision, are not eligible for continued coverage.  . . .

Id. at 32.[4]   In addition, although several "qualifying events" in addition to termination of employment and reduction in work hours are specified in paragraphs (2) through (7) of this section, there is no question that any of these paragraphs are pertinent to this action; all refer to a Member's spouse, child, or retired Members, none of which are contended to be at issue in this case.  Id.

Subparagraph B of the COBRA section of the Medical Plan document, titled "Continuation Period," provided in pertinent part as follows:

> Following a qualifying event, health coverage can continue up to the maximum continuation period.  The maximum continuation period for a Member (and any Dependents) following a termination of employment or reduction in work hours is 18 months.  . . .

---

[4]Although this provision refers to Medicare, as the court has noted in section III.B. below,  plaintiff has not alleged that he became entitled to Medicare during the period in question in this action, even though he alleges that he was determined to be disabled.

> Following a termination of employment or reduction in work hours, a qualified
> person may request an 11-month extension of COBRA continuation.  The
> maximum COBRA continuation will be 29 months (see Disabled Extension,
> Section D).
>
>                                      * * *

Id. at 33.  Although the Plan's following paragraph, subparagraph C, titled, "Second Qualifying

Events," provides for an extension of up to 36 months for "qualified Dependents" in the event of

the occurrence of a second "qualifying event" already defined, id., as noted above, there is no

allegation in this case that coverage for dependents of plaintiff – if any exist – is at issue.

However, the parties do not dispute that subparagraph D, the "Disabled Extension" provision, is

applicable here, providing in pertinent part as follows:

> Following a termination of employment or reduction in work hours, a qualified
> person (Member of Dependent) who has been determined disabled by the Social
> Security Administration either before or within 60 days after a qualifying event
> may request an extension of the continued coverage from 18 months to 29
> months.  . . .  The disabled extension applies to each qualified person (the
> disabled person and any family members) who is not disabled, who are entitled to
> COBRA continuation as a result of termination of employment or reduction in
> work hours.
>
>                                      * * *

Id. at 34.[5]  Although the Medical Plan provides for an extension of continuation coverage in the

event of disability, subparagraph E of the COBRA continuation provision expressly provides

that continued coverage "ends" on "[t]he date the qualified person enrolls in Medicare."  Id. at

---

[5]The language of subparagraph D is somewhat confusing in stating that the extension
"applies to each qualified person . . . who is not disabled . . . .  However, as the court has noted,
the parties do not dispute that the disabled extension applied to plaintiff in the event of a timely
request.

34.     Subparagraph F of the COBRA continuation provision, titled, "Employer/Plan

Administrator Notification Requirement," further provides that

> When a Member or Dependent becomes ineligible and loses group health
> coverage due to termination of employment, reduction in work hours, death of the
> Member, the Member becomes entitled to Medicare, or if the group plan covers
> retired Members, . . . the employer must notify the plan administrator of the
> qualifying event.  The plan administrator must notify the qualified person of the
> right to COBRA continuation within 14 days after receiving notice of a qualifying
> event from the employer.

Id. at 34.  Subparagraph G of the COBRA continuation provision, titled, "Qualified Person

Notification Requirement," also places notification responsibilities on "qualified persons."  The

relevant portions of this provision are as follows:

> Qualified persons who request an extension of COBRA due to disability must
> submit a written request to the plan administrator before the 18-month COBRA
> continuation period ends and within 60 days after: (a) the date of disability
> determination by the Social Security Administration; (b) the date of the qualifying
> event; (c) the date the qualified person would otherwise lose coverage as a result
> of a qualifying event; or (d) the date the qualified person is first informed of this
> notice obligation; otherwise the right to the disabled extension ends.  . . .
>
> Notification of a qualifying event to the plan administrator must include the
> following information: (a) name and identification number of the Member . . .; (c)
> if the notice is for an extension due to disability, a copy of any letters from the
> Social Security Administration and the Notice of Determination; and (d) the
> name, address and daytime phone number of the qualified person (or legal
> representative) that the plan administrator may contact if additional information is
> needed to determine COBRA rights.

                                    * * *

Id. at 35.  Finally, for purposes relevant to this action, subparagraph I of the COBRA

continuation provision, titled, "Contact Information," provided as follows:

> To notify the plan administrator of an initial or second qualifying event, request a disabled extension, request termination of COBRA, change of address, or request additional information concerning the group plan or COBRA, contact the following:
>
> For initial events, notify:
>> Northside Hospital, Inc.
>> Attn: Benefits Department
>> 1000 Johnson Ferry Road NE
>> Atlanta GA 30342-1606
>> Telephone (404) 851-8393
>
> For all other requests, notify:
>> COBRA Administration
>> PO Box 10310
>> Des Moines IA 50306-0310
>> Telephone (515) 273-0950

Id. at 37.

Northside also provided its employees with life insurance. This benefit, like the health insurance benefit, apparently continued after plaintiff's employment ended. The coverage provided for an "accelerated benefit" as an advance payment, before death, in the event of a terminal illness. Defendant's Exhibit (doc. no. 28-10) at 40.

Northside, acting in its capacity as employer, plan sponsor, and plan administrator, hired Principal to perform "certain non-discretionary claims and administrative functions" for Northside's employee welfare benefit plan, in a separate "Agreement for Administrative Services" executed by these two parties. Defendant's Exhibit (doc. no. 28-3) at 2. To this end, Principal is listed in the Medical Plan document under the definition of "Claims Administrator." Defendant's Exhibit (doc. no. 28-2) at 7. However, although the P.O. Box address listed in the COBRA provision of the Medical Plan document appears to be an address for Principal, which is

located in Des Moines, Iowa, no other provisions of the Medical Plan document itself expressly places any particular responsibilities on Principal, whose duties appear to be solely defined by the Agreement for Administrative Services.

The Agreement for Administrative Services contains a number of provisions relevant to this action, even though they are not incorporated into the Medical Plan document.  These provisions are as follows:

1.  **Relationship of the Parties.**

    a.    In performing this Agreement, Principal is acting solely as the delegee of certain claims and administrative functions of the Plan Administrator, and shall be deemed to be a fiduciary only to the extent, if any, that Principal actually exercises discretion with respect to assets of the Plan.  This Agreement does not delegate nor confer discretionary authority or fiduciary responsibility on Principal, it being the intent of these Parties that the claims and administrative functions hereby delegated by the Plan Administrator to Principal are non-discretionary and are subject to ultimate discretionary authority retained by the Plan Administrator.

    b.    This Agreement is between Principal and the Plan Administrator.  It is to be performed by these Parties, and each of them, for the benefit of the Plan.  It does not create any rights, obligations or legal relationships between Principal and any Participant or other person.

3.  **Claims and Administrative Functions**

    a.    To enable Principal to perform this Agreement, The Plan Administrator shall:

    1.)    Furnish to Principal a copy of the Plan Document stating eligibility, benefits, and any limitations or exclusions, and instruct Principal on any procedures or practices to be followed which are not self-evident from The Plan Document.

8

* * *

3.)     Establish an acceptable bank account (the 'Plan Account') from which electronic funds transfers ('EFTs') can be made to cover claims payments drawn by Principal for benefits due from the Plan . . .

4.)     Exercise ultimate decisional authority with respect to any questions or disputes about eligibility or benefits from the Plan.

* * *

b.     Principal shall:

1.)     Assist the Plan Administrator in the  preparation and updating of the Plan Document and other disclosure and reporting documents required by ERISA.

* * *

3.)     Apply the terms of the Plan Document and the instructions from the Plan Administrator to the facts and circumstances of claims for benefits from the Plan by Participants . ..

4.)     Follow the claims administration procedures and practices as instructed by the Plan Administrator . . .

5.)     Assist the Plan Administrator in investigating those claims for which benefits from the Plan have been declined, wholly or in part, and for which a further review or appeal has been requested duly by or on behalf of a Participant.

* * *

9.)     Provide information concerning Plan eligibility and benefit provisions to Participants and their health care providers who contact Principal. Such information shall not constitute a determination of what benefits actually will be paid for a specific claim, nor a certification or guarantee that any amount will be paid by the Plan, and disclaimers to that effect will be given to Participants and providers who seek information.  Benefit determinations can be made only after a complete claim is submitted to the Plan and processed according to the terms of the Plan, including all eligibility requirements, limitations, exclusions,

9

and other provisions of the Plan applicable to that claim.

* * *

Defendant's Exhibit (doc. no. 28-3) at 2-4.

Through his employment with Northside, plaintiff became a participant in the hospital's various employee benefit plans, including both health and life insurance.   There is no dispute that at the time of his resignation, plaintiff was given notice of his right to elect COBRA continuation of his health insurance coverage when his employment terminated: plaintiff states, at the outset of his response brief, that he in fact "elected continuation of health care coverage under COBRA."  Plaintiff's Response in Opposition to Defendant Principal Life Insurance Company's Motion for Summary Judgment ("Plaintiff's Response") at 2.[6]

On March 8, 2006, plaintiff sent a letter to Principal requesting a copy of the "policy book and terms of coverage" of the life insurance coverage.  (Plaintiff explained that he had "discarded" these materials because he did not realize he was eligible to continue coverage.)  In his letter, plaintiff also requested "the necessary forms to apply for accelerated benefits." Defendant's Exhibit (doc. no. 28-11).  Plaintiff in fact received an accelerated cash payment of his life insurance proceeds on or about August 11, 2006, together with a letter from Principal explaining how this payment affected his life insurance benefit.  Defendant's Exhibit (doc. no. 28-6).  Although Principal's letter of August 11, 2006 makes reference to a "group policy," id.,

_____

[6]Plaintiff's *pro se* amended complaint alleges that he was denied an 11-month disability extension of his COBRA coverage.  Amended Complaint at 2, ¶ 6.  It would hardly be possible to request such an extension unless plaintiff had already elected COBRA coverage following the termination of his employment.

10

Principal contends that it did not provide plaintiff with the "policy book" he requested because no such document existed.  Principal contends that it referred plaintiff to Northside for additional information regarding his life insurance coverage.

It is also undisputed that plaintiff was given notice of his right to seek a disability extension of his COBRA coverage: this right is clearly specified in the "COBRA Continuation Election Form" which plaintiff admits he received and completed after his employment with Northside ended.  Id. at 3; Plaintiff's Exhibit 5.[7]  On May 22, 2006, plaintiff was determined by the Social Security Administration ("SSA") to be totally disabled.  He forwarded the SSA's Notice of Award to Principal on July 3, 2006, together with a letter stating, "I am forwarding to you a 'Notice of Decision' from Social Security.  I was granted Social Security benefits." Plaintiff's Exhibit 6.  The second sentence of plaintiff's letter pertained expressly to life insurance, stating, "I am also forwarding to you the completed 'Accelerated Benefit Request' for my life insurance[.]"    The letter, which plaintiff addressed to the wrong department at Principal, did not expressly mention Northside's Medical Plan or indicate that plaintiff was requesting a

---

[7]Plaintiff's right to request such an extension is also contained in a separate notice which Principal contends plaintiff received with his COBRA election form.  Defendant's Exhibit (doc. no. 28-12).  In his response, plaintiff has  not disputed that he received this notice with his election form.

The final page of the "COBRA Continuation Election Form" which plaintiff completed instructed him to sent the signed form and initial payment to "Principal Life Insurance Company, Attn: Dana South, P.O. Box 10310, Des Moines, IA 50306-0310."  Plaintiff's Exhibit 5.  This is consistent with the notice plaintiff was provided with the election form, which – among other things – instructed plaintiff to send any request for disability extension to "Principal Life Insurance Company, Attn: Dana South, P.O. Box 10310, Des Moines, IA 50306-0310" and provided a telephone contact number.  Defendant's Exhibit (doc. no. 28-12) at 6.

disability extension of his COBRA health insurance coverage.[8]

Plaintiff contends that after he sent the July 3, 2006 letter, he received monthly COBRA health insurance premium statements indicating that his coverage would cease at the end of the original 18-month period.   Plaintiff, who apparently intended his correspondence to be construed as a request for a disability extension of his COBRA coverage even though it mentioned only life insurance, also contends that he telephoned Principal to inquire about the extension – with no results.  Finally, he contends, on August 25, 2006 he sent Principal another letter, accompanied by another copy of the SSA determination.  Plaintiff's Exhibit 7.  In this letter, plaintiff stated that he believed that his receipt of Social Security disability benefits made him eligible for an 11-month extension of his health insurance coverage.  Plaintiff also advised that he had already forwarded "another copy of social security papers," and asked Principal to "recheck [its] system" for these records.

Although Principal does not dispute that it actually timely received plaintiff's July 3, 2006 letter and SSA Notice of Award, Principal contends that because plaintiff did not send a copy of his SSA Notice of Award to Northside or to Principal's COBRA department, it believed that plaintiff had failed to submit a written request for the extension of COBRA coverage within the required 60 days after a disability determination.   Principal therefore denied plaintiff an extension.  On September 8, 2006, Principal sent plaintiff a notice of the denial and the reason for it.  Plaintiff's Exhibit 8.

---

[8]Plaintiff addressed his letter to Jennifer Repp in "Life and disability Claims" at Principal, not to Dana South, contrary to the instructions which he had been provided at the time of his COBRA election.  Plaintiff also included a "RE:" line in his letter, identifying "Accelerated Benefit" as the sole subject of his correspondence.  Plaintiff's Exhibit 6.

On October 16, 2006, plaintiff sent Northside a letter, complaining that Principal had refused him an 11-month disability extension of his health insurance coverage. Plaintiff's letter provided Northside with certain facts which he believed justified his position, and reasserted his request for the extension, "with no interruption in coverage." Plaintiff's Exhibit 9. Northside responded to plaintiff by letter dated November 13, 2006, simply reaffirming Principal's position that plaintiff had provided timely notice of the May 22, 2006 disability determination. Plaintiff's Exhibit 10.

Plaintiff's next response was a December 15, 2006 letter addressed to Northside's general counsel, in which plaintiff essentially threatened litigation over what he alleged were ERISA and COBRA violations. Plaintiff's Exhibit 11. This apparently prompted Northside to ask Principal to review its records. Principal did so, and discovered that plaintiff had, in fact, timely submitted proper documentation of his request for an 11-month disability extension of his COBRA health insurance coverage to the company's Life and Disability department. By this time, plaintiff's coverage had been terminated, and Principal inquired of Northside whether the coverage should be reinstated with plaintiff paying the retroactive premium. Northside responded affirmatively. Plaintiff's Exhibit 12.

Plaintiff does not dispute that his COBRA benefits were retroactively reinstated; he contends that he became aware of the reinstatement when he received a bill from Principal on February 22, 2007 for $3,412.77 in back premiums for December, 2006, and January and February, 2007, in addition to a premium for March, 2007. Plaintiff's Exhibit 13. It is unclear whether plaintiff elected to pay for the reinstated coverage, however, for he alleges that he had been forced to seek replacement health insurance coverage from Blue Cross/Blue Shield – at a

higher premium – when his COBRA coverage was terminated in November, 2006.  Plaintiff also contends that he was forced to incur substantial out-of-pocket costs for medical and prescription drug expenses during the time that his COBRA coverage was cancelled.

Plaintiff filed his *pro se* complaint in this action on February 15, 2007, asserting claims against Northside for violation of both ERISA and the COBRA amendments.   Plaintiff later filed an amended *pro se* complaint which added Principal as a defendant, but otherwise made no substantive changes to his pleading.   Plaintiff's *pro se* pleading seeks "appropriate equitable relief" for the alleged denial of health insurance continuation and denial of plan information. Amended Complaint at 2, ¶ 3.   Plaintiff's *pro se* amended complaint also more specifically demands relief as follows:

A)   $15,000.00 medical reimbursement
B)   Reinstatement of health insurance without penalty
C)   $175,000.00 statutory penalties
D)   Attorney fees/court cost
E)   An External review/audit of defendant's [sic] Human Resource and administration policy and activities with the intent of identifying and correcting processes of eliminating persons, with chronic or terminal illnesses, from their insurance pool.

Plaintiff has procured counsel, who entered an initial appearance on plaintiff's behalf on August 23, 2007.  Although plaintiff has not sought leave to amend the relief demanded in his *pro se* pleading, it appears that he has determined not to assert a claim for benefits in the form of reinstated health insurance coverage; plaintiff in fact concedes that he is not asserting a claim for benefits under the Medical Plan, but rather damages consisting of the cost of his premiums for purchase of  alternative health insurance.  Plaintiff's Response at 12.  It is unclear whether plaintiff is still pursuing the "equitable" relief of an audit or review of either defendant's "policy

and activities" as demanded in the complaint.   (The amended complaint refers to "defendant" in the singular without differentiation between the two named defendants.)

## II

Plaintiff and Principal are in agreement that Northside's health and life insurance plans qualify as ERISA plans and that plaintiff was a participant in the plans.  However, in its motion, Principal correctly observes that plaintiff's pleading does not identify which statutory provision(s) he believes Principal has violated.[9]  Principal nonetheless argues that it is not liable for any of the violations which plaintiff alleges may have occurred, or for statutory penalties, because it is not the plan administrator or fiduciary.

The same familiar summary judgment standards apply as much to an ERISA action as they do to any other civil action – at least where the claim is not one for wrongful denial of benefits.  See Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 617-620 (6th Cir.1998) (noting "great confusion among the district courts as to the proper method of adjudicating proceedings brought under 29 U.S.C. § 1132(a)(1)(B)") (Gilman, J., concurring).  Summary

---

[9]By way of a footnote contained in his response brief, plaintiff concedes that his pleadings are not "the polished work of an attorney[.]"  Plaintiff's Response at 5 n.3. Nonetheless, plaintiff states, because "it appears that there is no serious or significant dispute among the parties as to what [plaintiff's] legal claims are, it would not seem necessary to amend the pleadings yet again.  However, if the Court deems that such amendment might be useful to the parties, to help narrow the issues in this matter, Plaintiff is more than willing to do so."  Id.
It is not the court's place to instruct a represented party regarding whether amendment would be "useful" to that party's case.  Although plaintiff filed his amended complaint *pro se*, he is now represented by counsel.  Plaintiff's counsel has not sought leave to amend.  Although the deadline established for amendment of the pleadings has passed, this does not – of course – prevent a party from seeking leave to amend.  However, because plaintiff has not sought leave to amend since counsel filed an appearance on his behalf, the court assumes that plaintiff is satisfied with his current pleading.

judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  In evaluating a motion for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the burden of establishing the non-existence of any genuine issue of material fact and may satisfy this burden by "'showing'-- that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party satisfies its burden, the party opposing the motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.  Id. at 255.  However, the mere existence of a "scintilla of evidence" in support of the non-moving party's position is insufficient.  Id.  The party who bears the burden of proof must present a jury question as to each element of a challenged claim. Davis v. McCourt, 226 F.3d 506, 511 (6th Cir. 2000).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, at 322-323.  "In such a situation, there can

16

be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an

essential element of the nonmoving party's case necessarily renders all other facts immaterial."

Id.  Only factual disputes which may have an effect on the outcome of a lawsuit under the

applicable substantive law are "material."  Anderson, 477 U.S. at 248.  Failure to prove an

essential element of a claim renders all other facts immaterial for summary judgment purposes.

Elvis Presley Enters, Inc. v. Elvisly Yours, Inc., 936 F.2d 889, 895 (6th Cir. 1991).

Although plaintiff's *pro se* amended complaint seeks as relief, in part, "[r]einstatement of

health insurance without penalty[,]" Amended Complaint at 3, ¶ 10(B), as the court has noted,

this relief is no longer at issue in this action.[10]   Therefore, because plaintiff no longer has a live

claim for denial of benefits, exhaustion of administrative remedies is not required.  See, e.g., Hill

v. Blue Cross and Blue Shield of Michigan, 409 F.3d 710, 719 (6th Cir. 2005) ("Beneficiaries

seeking to recover improperly denied benefits must first exhaust the administrative remedies

available to them, unless doing so would be futile or would furnish inadequate relief").  The court

also need not be concerned with the application of any deferential standard of review which may

be applicable to such claims.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115

(1989) (denial of benefits "is to be reviewed under a de novo standard unless the benefit plan

gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or

to construe the terms of the plan").  The court likewise need not be concerned with limiting its

review of evidence to that contained in the administrative record.  See Wilkins, 150 F.3d at 615

---

[10]In its motion, Principal states that plaintiff's health coverage was reinstated and that
therefore any request for the equitable remedy of reinstatement is moot.  Brief in Support of
Defendant Principal Life Insurance Company's Motion for Summary Judgment at 2.  Plaintiff
has not disputed this statement.

(in ERISA action alleging denial of benefits, district court review was confined to the record that was before the plan administrator).

The parties have had discovery.  The Case Management Order required the completion of discovery by not later than December 30, 2007.  Therefore, discovery is now closed.  Although Principal actually filed its motion before the close of discovery (a fact which plaintiff has felt compelled to note in his response), this fact alone is not controlling.  Fed.R.Civ.P. 56(b) permits a defending party to move for summary judgment, with or without supporting affidavits, "at any time" after the action is filed.  Notwithstanding this express provision, "the general rule" which has developed  "is that summary judgment is improper if the non-movant is not afforded a sufficient opportunity for discovery."  Vance v. United States, 90 F.3d 1145, 1148 (6th Cir. 1996) (citing White's Landing Fisheries, Inc. v. Buchholzer, 29 F.3d 229, 231-232 (6th Cir.1994) and Plott v. General Motors Corp., 71 F.3d 1190, 1195 (6th Cir.1995)).   However, in order to preserve an argument that the grant of summary judgment precluded necessary discovery, a party opposing a motion for summary judgment must comply with the strictures of Fed.R.Civ.P. 56(f), under which the district court may defer a ruling on the motion, pending discovery, "if the non-movant submits affidavits stating that 'the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition."  Plott, 71 F.3d at 1196 (citations omitted).[11]  If

--------

[11]Before December 1, 2007, the language of Fed.R.Civ.P. 56(f) read as follows:

> **(f) When Affidavits are Unavailable.** Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

(continued...)

an opponent does not file either a Rule 56(f) affidavit or a motion giving the district court a chance to rule on the need for additional discovery, the purported need for such additional discovery becomes a non-issue.  See id.  Because plaintiff has not availed himself of the procedure provided by Rule 56(f), the mere fact that Principal filed its motion before the close of discovery does not prevent the court from ruling.

## III

Plaintiff has stated that he is seeking three things in this lawsuit.  To quote plaintiff, he seeks the following:

    (1)     statutory penalties under ERISA, for failure to provide requested plan information regarding his life insurance benefits;

    (2)     statutory penalties for failure to provide adequate COBRA election notices regarding a 'secondary event,' i.e., [plaintiff's] disability; and

    (3)     damages for breach of fiduciary duty, related to Defendants' improper termination of [plaintiff's] COBRA benefits.

Plaintiff's Response at 5 (footnote omitted).  Principal seeks summary judgment on all of the claims against it.

## A.  Breach of Fiduciary Duty

---

[11](...continued)
Rule 56 was amended effective December 1, 2007.  However, the amendments were stylistic only.  Fed.R.Civ.P. 56 advisory committee's note.

Plaintiff alleges that Principal is liable to him for breach of fiduciary duty because it improperly terminated his COBRA health insurance benefits. Principal's motion for summary judgment directed to his claim is two-pronged. Principal argues (1) that it is not a fiduciary under the Medical Plan, and (2) that it did not improperly terminate plaintiff's coverage.

As noted above, plaintiff in fact concedes that he is not asserting a claim for benefits under the Medical Plan, but rather damages consisting of the cost of his premiums for purchasing alternative health insurance. Plaintiff's Response at 12. As Principal has noted, plaintiff's Amended Complaint does not specifically identify the provision of ERISA under which he seeks reimbursement for the cost of alternative health coverage. Principal nonetheless assumes that plaintiff brings this particular claim under section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

Under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), a participant or beneficiary may bring a civil action "to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." However, plaintiff is no longer seeking recovery of benefits due him under the Medical Plan; he therefore accuses Principal of "wrongly characteriz[ing]" his claim for reimbursement as a claim for benefits, arguing that he is instead seeking "damages he suffered as a result of the wrongful cancellation of his COBRA benefits." Plaintiff's Response at 12. Plaintiff argues that "[i]f Principal is found to be a fiduciary, or acting in a fiduciary capacity with respect to administration of plan benefits, then Principal can be held liable . . . for damages arising from the improper termination of his COBRA benefits." Id.

20

Plaintiff has not elaborated on the precise statutory basis of his claim for damages. However, to the extent that plaintiff seeks relief not under 29 U.S.C. § 1132(a)(1) but instead under §§ 1132(a)(2) and 1109, the relief available is generally limited to recovery on behalf of the plan.  See Mertens v. Hewitt Associates, 508 U.S. 248, 252 (1993) ("The fiduciary is personally liable for damages ('to make good to [the] plan any losses to the plan resulting from each such breach'), for restitution ('to restore to [the] plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary'), and for 'such other equitable or remedial relief as the court may deem appropriate,' including removal of the fiduciary"); see also Adcox v. Teledyne, Inc., 21 F.3d 1381, 1390 (6th Cir.1994) ("a cause of action under § 1132(a)(2) permits recovery to inure only to the ERISA plan, not to individual beneficiaries"). Extracontractual compensatory damages are not available in an action under § 1109. Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 144 (1985).  Monetary damages are likewise not a proper form of individual equitable relief under § 1132(a)(3).  Marciella v. Prudential Ins. Co. of America, No. 93-3559,1994 WL 376868, *7 (6th Cir. July 18, 1994).

In any event, as Principal has observed, it is not a fiduciary.  ERISA defines a fiduciary as follows:

> Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (I) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21)(A).   Only when fulfilling the particular functions defined in this section, including the exercise of discretionary authority or control over plan management or administration, does one become a fiduciary under the statute.   Lockheed Corp. v. Spink, 517 U.S. 882, 890 (1996); see also Briscoe v. Fine, 444 F.3d 478, 486 (6th Cir. 2006) ("functional test" determines fiduciary status).   "[A] person without the power to make plan policies or interpretations but who performs purely ministerial functions such as processing claims, applying plan eligibility rules, communicating with employees, and calculating benefits, is not a fiduciary under ERISA." Baxter v. C.A. Muer Corp., 941 F.2d 451, 455 (6th Cir. 1991).

The Medical Plan expressly names Northside as both "Plan Administrator" and "the primary fiduciary with respect to the operation and administration" of the Medical Plan.   The Medical Plan also expressly permits Northside – as the employer and sole source of funds for the plan – to employ others to  "provide administrative services" and "assist in the administration of the Plan."   Although Principal is listed in the Medical Plan document as "Claims Administrator," the Medical Plan reserves to Northside, "as plan administrator within the meaning of ERISA," the "complete discretion to construe or interpret the provisions of this Plan, to determine eligibility for benefits from this Plan, and to determine the type and extent of benefits, if any, to be provided" by the Medical Plan.

Consistent with the terms of the Medical Plan, Northside, as employer, plan sponsor, and plan administrator, hired Principal to perform "certain non-discretionary claims and administrative functions" for that plan, pursuant to the Agreement for Administrative Services between those two parties.  However, that agreement – which is not incorporated into the Medical Plan – provides that Principal acts "solely as the delegee" of Northside.  The agreement

further provides that Principal "shall be deemed to be a fiduciary only to the extent, if any, that Principal actually exercises discretion with respect to assets of the Plan."  Importantly, the agreement expressly provides that it "does not delegate nor confer discretionary authority or fiduciary responsibility on Principal, it being the intent of these Parties that the claims and administrative functions hereby delegated by the Plan Administrator to Principal are non-discretionary and are subject to ultimate discretionary authority retained by the Plan Administrator."  Finally, the agreement further provides that it "does not create any rights, obligations or legal relationships between Principal and any Participant or other person."

The evidence indicates that nothing in either the Medical Plan or the Administrative Services Agreement suggests that Principal was given discretionary authority or responsibility with respect to the Medical Plan.  Although conceding that "the exercise of discretionary responsibility with regard to administration of the plan is the hallmark of fiduciary status," plaintiff argues that "[w]hether or not Principal exercised such discretion, and therefore satisfies the definition of 'fiduciary,' is, however, a question of fact."  Plaintiff's Response at 12-13. Plaintiff also argues that there is evidence that Principal engaged in discretionary decisionmaking in terminating his COBRA benefits because (1) Principal alone sent him a letter on its own letterhead notifying him that his 11-month disability extension was denied, and (2) Principal engaged in joint discussions with Northside before a decision was made to reinstate plaintiff's benefits.

Principal's letter to plaintiff initially notifying him that his extension had been denied was sent in its capacity as Claims Administrator, which permitted Principal, as delegate of Northside, to apply the terms of the Medical Plan and follow the claims procedures established

by Northside.  In addition, Principal's engaging in "joint discussions" with Northside regarding the reinstatement of plaintiff's benefits was also entirely consistent with the Administrative Services Agreement, which required Principal to "[a]ssist the Plan Administrator [Northside] in investigating those claims for which benefits from the Plan have been declined, wholly or in part, and for which a further review or appeal has been requested duly by or on behalf of a Participant."  Principal's actions do not suggest that it had discretionary authority to either terminate or reinstate plaintiff's benefits.  Under the circumstances, the court concludes that plaintiff has not pointed to any evidence which permits a reasonable inference that Principal acted as a fiduciary within the meaning of ERISA.

Principal also argues that even if it could be deemed a proper defendant on plaintiff's claim for breach of fiduciary duty, Principal did not improperly terminate plaintiff's coverage. ERISA requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent" with the law. 29 U.S.C. § 1104(a)(1)(D).  Here, the relevant plan language expressly required a "qualified person" – such as plaintiff – requesting an extension of COBRA coverage due to a disability to submit a written request to the plan administrator both before the 18-month COBRA continuation period ended and within 60 days after the date of disability determination by the SSA.[12]  The Medical Plan also expressly required all requests – other than notification of initial

_____

[12]This plan language is entirely consistent with the obligation imposed by law, which provides that

each covered employee or qualified beneficiary is responsible for notifying the
(continued...)

"qualifying events" (such as the termination of plaintiff's employment) – to be sent to "COBRA Administration," listing the specific post office box in Des Moines, Iowa where the request should be sent.[13]

Instead of complying with the notice requirements, plaintiff simply mailed the notice of his social security award to Principal's life and disability office together with a letter requesting an accelerated life insurance benefit.  The letter, which was clearly sent to the wrong department at Principal, did not even expressly request an extension of plaintiff's COBRA coverage under the Northside Medical Plan.   Therefore, plaintiff has not shown that he fulfilled either the Medical Plan's requirements for notice or the minimal legal requirements for notice specified by law.[14]

_____

[12](...continued)
administrator of the occurrence of any qualifying event described in paragraph (3) or (5) of section 1163 of this title within 60 days after the qualifying event and each qualified beneficiary who is determined, under title II or XVI of the Social Security Act [42 U.S.C.A. § 401 et seq. or 1381 et seq.], to have been disabled at any time during the first 60 days of continuation coverage under this part is responsible for notifying the plan administrator of such determination within 60 days after the date of the determination[.]

29 U.S.C. § 1166(a)(3).

[13]As the court previously noted above, the final page of the "COBRA Continuation Election Form" which plaintiff completed also instructed him to sent the signed form and initial payment to Principal, with attention to Dana South, at a post office box in Des Moines, Iowa and provided a telephone contact number.

[14]Applicable regulations specify what must be contained within a notice in order for it to be deemed timely:

**(d) Required contents of notice.**

(1) A plan may establish reasonable requirements for the content of any notice described in this section, provided that a plan

(continued...)

By the time plaintiff wrote to Principal at the correct Des Moines post office box address and expressly requested an 11-month extension of his COBRA coverage, the required notification period had passed, and consequently Principal – which believed that plaintiff had not submitted timely notification of his disability – followed the dictates of the plan language and denied plaintiff's claim for continuation of his coverage beyond the initial 18-month period. This initial denial by Principal was therefore the direct result of plaintiff's own error in failing to both expressly request a COBRA extension and to send notice of his disability to the correct department at Principal.  Under the circumstances, this initial denial was not caused by any improper actions of Principal, and cannot be a source of liability for breach of fiduciary duty.

**B.  Failure to Provide COBRA Election Notices Regarding a "Secondary Event"**

Principal also argues that it is not liable to plaintiff for any failure to provide him with COBRA election notices regarding a "secondary event" because (1) Principal is not a plan administrator liable for statutory penalties under 29 U.S.C. § 1132(c), and (2) in any event, plaintiff received all required COBRA election notices.  The court addresses Principal's first

---

[14](...continued)

> may not deem a notice to have been provided untimely if such notice, although not containing all of the information required by the plan, is provided within the time limit established under the plan in conformity with paragraph (c) of this section, and the administrator is able to determine from such notice the plan, the covered employee and qualified beneficiary(ies), the qualifying event or disability, and the date on which the qualifying event (if any) occurred.

29 C.F.R. § 2590.606-3.

argument in part C below, with respect to plaintiff's claim for statutory penalties for failure to provide requested Plan information regarding life insurance benefits.  However, even if Principal is an entity which may in some circumstances be held liable for statutory penalties, the court concludes that Principal's second argument is a correct one:   plaintiff was provided all notice required by law.   Therefore, Principal is entitled to summary judgment in its favor as a matter of law on plaintiff's claim alleging failure to provide notice.

Where COBRA applies, its rights include the opportunity to continue health care coverage under the employer's plan if a "qualifying event" occurs.  29 U.S.C. § 1161(a).[15] Termination of employment, other than for gross misconduct, is a qualifying event.  29 U.S.C. § 1163(2).[16]  As the court will discuss in greater detail below, another qualifying event occurs

---

[15]Section 601(a) of ERISA, as amended, provides in pertinent part that

The plan sponsor of each group health plan shall provide, in accordance with this part, that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan.

29 U.S.C. § 1161(a).

[16]Section 603 of ERISA defines those events deemed to be "qualifying" as follows:

For purposes of this part, the term 'qualifying event' means, with respect to any covered employee, any of the following events which, but for the continuation coverage required under this part, would result in the loss of coverage of a qualified beneficiary:

(1) The death of the covered employee.

(2) The termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment.

(continued...)

when a covered employee becomes entitled to Medicare benefits under title XVIII of the Social

Security Act, 42 U.S.C. § 1395 *et seq.*  29 U.S.C. § 1163(4).

The statute requires the administrator of a group health plan to notify a "qualified

beneficiary" of his or her COBRA rights upon the occurrence of a "qualifying event," as follows:

> the administrator shall notify--
>
> (A) in the case of a qualifying event described in paragraph (1), (2), (4), or (6) of section 1163 of this title, any qualified beneficiary with respect to such event, and
>
> (B) in the case of a qualifying event described in paragraph (3) or (5) of section 1163 of this title where the covered employee notifies the administrator under paragraph (3), any qualified beneficiary with respect to such event,
>
> of such beneficiary's rights under this subsection.

29 U.S.C. § 1166(a)(4).  A "qualified beneficiary," for purposes of COBRA continuation

coverage, is defined as follows:

---

[16](...continued)
> (3) The divorce or legal separation of the covered employee from the employee's spouse.
>
> (4) The covered employee becoming entitled to benefits under title XVIII of the Social Security Act [42 U.S.C.A. § 1395 et seq.].
>
> (5) A dependent child ceasing to be a dependent child under the generally applicable requirements of the plan.
>
> (6) A proceeding in a case under Title 11, commencing on or after July 1, 1986, with respect to the employer from whose employment the covered employee retired at any time.

29 U.S.C. § 1163.

(A) In general

The term 'qualified beneficiary' means, with respect to a covered employee under a group health plan, any other individual who, on the day before the qualifying event for that employee, is a beneficiary under the plan--

(i) as the spouse of the covered employee, or

(ii) as the dependent child of the employee.

Such term shall also include a child who is born to or placed for adoption with the covered employee during the period of continuation coverage under this part.

(B) Special rule for terminations and reduced employment

In the case of a qualifying event described in section 1163(2) of this title, the term 'qualified beneficiary' includes the covered employee.

29 U.S.C. § 1167(3).  A "covered employee" is, unsurprisingly, defined as "an individual who is (or was) provided coverage under a group health plan by virtue of the performance of services by the individual for 1 or more persons maintaining the plan (including as an employee defined in section 401(c)(1) of Title 26)."  29 U.S.C. §1167(2).

As noted above, there is no question that plaintiff received written notice of his COBRA rights at the time his employment ended, which was a "qualifying event."  Plaintiff actually completed and returned the COBRA Continuation Election Form, resulting in the continuation of health insurance coverage.  Therefore, it is undisputed that plaintiff was provided the required notice at the time of his initial "qualifying event," the termination of his employment.

What, then was the "secondary qualifying" event to which plaintiff alludes in his amended complaint?  According to plaintiff's brief in response to the current motion, the

"secondary event" – as he called it – is plaintiff's disability.[17]

However, nowhere in his brief does plaintiff cite to any legal authority – statutory or

otherwise – requiring anyone to give *him* notice under COBRA for a "secondary event"

consisting of plaintiff's own disability.  That is because such authority does not exist.  An

employee's own disability is not a secondary "qualifying event" triggering the duty of an

employer or plan administrator to provide an election notice to that employee under the COBRA

amendments to ERISA.

As noted above, a plan administrator's duty to notify a "qualified beneficiary" of his or

her rights is triggered upon specified "qualifying events" pursuant to 29 U.S.C. § 1166(a)(4).

However, section 1166(a)(4) references specific "qualifying events" listed under the subsections

of section 1163.  Subsection (B) of section 1166(a)(4), which references only subsection (3) and

(5) of section 1163, which pertain to divorce or legal separation of the covered employee and to

a dependent child ceasing to be dependent, clearly does not apply here.  Subsection (A) of

section 1166(a)(4) also references subsections of section 1163 which likewise do not apply here:

death of the covered employee, 29 U.S.C. §1163(1);  termination of the covered employee's

employment, 29 U.S.C. § 1163(2), for which Northside had, of course, already provided plaintiff

with the required notice; and bankruptcy, in the case of a retired employee.  29 U.S.C. § 1163(6).

There is one other "qualifying event" listed in subsection (B) of section 1166(a)(4) as

triggering notice to a "qualified beneficiary":   the covered employee "becoming entitled to

---

[17]In his *pro se* amended complaint, plaintiff actually refers to unspecified "secondary
qualifying event**s**" in the plural.  Amended Complaint at 2, ¶ 6 (emphasis supplied).  However, in
his response brief, filed through counsel, plaintiff refers to "***a*** secondary event" in the singular,
followed by the notation "Mr. Thorn's disability."  Plaintiff's Response at 5.

benefits under title XVIII of the Social Security Act," 42 U.S.C. § 1395 *et seq.*, an event defined

as "qualifying" under 29 U.S.C. § 1163(4).  However, this refers only to the covered employee

becoming entitled to Medicare, and not to his becoming entitled to disability benefits.[18]   Had

plaintiff become entitled to Medicare, his continued coverage could have been terminated,

pursuant to the terms of the Plan.  Plaintiff has not alleged that he became entitled to Medicare

benefits.  Indeed, as far as plaintiff was concerned his entitlement to Medicare would have been

a disqualifying event because it meant that he was no longer a "qualified beneficiary" entitled to

coverage under the Plan.[19]

_____

[18]COBRA coverage can be cut short if the employee becomes entitled to Medicare. 29 U.S.C. § 1162(2)(D)(ii).  <u>Youngstown Aluminum Products, Inc. v. Mid-West Ben. Services, Inc.</u>, 91 F.3d 22, 26 (6th Cir. 1996).  That termination of coverage can occur only in the event of the employee's entitlement to Medicare, and not merely his entitlement to disability benefits, is clearly reflected not only in the title of subsection (D) of section 1162, which reads, "Group health plan coverage or *medicare entitlement*" (emphasis supplied), but also in the language of part (ii) of subsection (D) of this statute, which refers to

> [t]he date on which the qualified beneficiary first becomes, after the date of the election--

>> (ii) in the case of a qualified beneficiary other than a qualified beneficiary described in section 1167(3)(C) of this title, entitled to benefits *under title XVIII of the Social Security Act [42 U.S.C.A. § 1395 et seq.].*

29 U.S.C. § 1162(D)(ii)(emphasis supplied).  Reference to "title XVIII of the Social Security Act and 42 U.S.C. §§ 1395 *et seq.*" clearly describes Medicare, not disability benefits, which are administered separately under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*  The Medicare Act, 42 U.S.C. § 1395 *et seq.*, created the Medicare program, which provides healthcare benefits for eligible persons, those who are at least sixty-five years old or disabled. 42 U.S.C. § 426.

[19]As indicated in note 18 immediately above, COBRA coverage may legally be terminated where the covered employee becomes entitled to Medicare.  29 U.S.C. § 1162(D)(ii); <u>see</u> 26 C.F.R. § 54.4980B-7 Q & A1(5) (COBRA continuation coverage may end "not before the

(continued...)

Regulations determining Medicare eligibility generally provide for hospital benefits for a person in plaintiff's situation only after 24 months of entitlement to Social Security disability benefits.  42 U.S.C. § 426(b); 42 U.S.C. § 1395c.  However, even if plaintiff had become entitled to Medicare, COBRA provisions would mandate notice only to a "qualified beneficiary" such as a spouse or child, and not to plaintiff himself.  29 U.S.C. § 1167(3)(A).  Although 29 U.S.C. § 1167(3)(B) provides a "special rule" for employment terminations or reductions (in those circumstances, a covered employee is also considered a "qualified beneficiary"), there is no corresponding special rule when the event is the employee's entitlement to Social Security benefits.  Karp v. Guardian Life Ins. Co. of America,  456 F. Supp.2d 1375, 1381-1382 (S.D. Ga. 2006), aff'd, 199 Fed. App. 870 (11th Cir. 2006).

Plaintiff's argument that he should have been provided some sort of "secondary" notice of his own disability simply makes no sense.  Both the law and the Medical Plan provide that it was *plaintiff* who was required to notify the plan administrator of the SSA's disability determination within 60 days after the determination was made.  29 U.S.C. § 1166(a)(3); Defendant's Exhibit (doc. no. 28-2) at 35.   Given this requirement, one wonders why plaintiff would form the belief that the Medical Plan administrator would have to give *plaintiff* notice of *plaintiff's own* disability.  Even more importantly, however, what plaintiff fails to comprehend – presumably because he has failed to read the applicable statutory provisions together with the controlling plan language – is that section 1166(a)(4) did not, as a matter of law, require that he be provided with any notice simply because he received an award of Social Security disability

---

[19](...continued)
earliest" of specified dates, including "[t]he date, after the date of the election, upon which the qualified beneficiary first becomes entitled to Medicare benefits").

benefits.  As section 1166(a)(4) indicates, two things are necessary to trigger the administrator's obligation to provide notice: (1) a "qualifying event," and (2) a "qualified beneficiary."  A "qualifying event" is one "which, but for the continuation coverage required under this part, would result in the loss of coverage of a qualified beneficiary[.]" 29 U.S.C. § 1163.  However, "qualifying" events are limited to six specified events, none of which includes the covered employee becoming "disabled."[20]   In plaintiff's case, the termination of his employment was the only "qualifying event" entitling him to COBRA notice, which he received.

Moreover, it is notable that the statute distinguishes "qualified" beneficiaries who are family members from the covered employee himself.   See McDowell v. Krawchison, 125 F.3d 954, 959 (6th Cir.1997) ("the definition of 'qualifying event' focuses largely on the resulting loss of coverage to other family members").  COBRA notice for "qualified beneficiaries" such as a spouse or child  is triggered not only when the covered employee is terminated, but also when he or she dies or becomes entitled to Medicare, when the covered spouse is divorced or legally separated from the covered employee, when a dependent child ceases to be a dependent child, or when an employer from whom the covered employee retired files for bankruptcy.  Id.; 29 U.S.C. § 1167(3)(A).  However,  the "covered employee" is deemed a "qualified beneficiary" only when he is terminated other than for gross misconduct or experiences reduced hours of employment. 29 U.S.C. § 1167(3)(B).  Under the COBRA statutory scheme, another "qualified beneficiary" might have certain rights, even where the covered employee does not.  McDowell,

---

[20]Although section 1163(4) lists the "covered employee becoming entitled to benefits under title XVII of the Social Security Act [42 U.S.C.A. § 1395 et seq.]" as a "qualifying event," as the court has indicated in note 18 above, this is a reference to the employee's entitlement to Medicare, not to social security.

125 F.3d at 959.

Aside from his entitlement to disability benefits, plaintiff has not alleged the occurrence of any other post-termination event that could be considered a "qualifying event" triggering the notice requirement of § 1166(a)(4). Moreover, plaintiff is simply not a "qualified beneficiary," for purposes of a second notice, as defined by 29 U.S.C. § 1167(3). Plaintiff has not identified any other statutory basis for his claim that he was entitled to a second COBRA notice beyond that which he was provided at the time his employment terminated. Therefore, even if Principal could be deemed an entity required to give notice under this statute, no genuine issue remains regarding whether that duty was violated in this case. Principal is therefore entitled to summary judgment in its favor on plaintiff's claim based on lack of notice.[21]


## C. Failure to Provide Plan Information Regarding Life Insurance Benefits

Plaintiff's final claim against Principal is that it is liable to him for statutory penalties under ERISA for failing to provide him with plan information he requested regarding his life insurance benefits. In its defense on this claim, Principal argues that it is not liable for penalties because it is not an entity which may be held liable for such penalties under the relevant law.

ERISA provides, in pertinent part, that "[t]he administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description,

---

[21]Plaintiff's failure to identify a specific, statutory basis for this claim is – at this stage – particularly troubling, and causes the court to question whether his counsel has even read the relevant COBRA provisions. Plaintiff's initial *pro se* allegation that he was entitled to a second notice is at least somewhat excusable; a layperson's erroneous interpretation of the law is at least understandable. However, it is inexcusable that plaintiff continued to press this particular claim after he obtained representation.

and the latest annual report, any terminal report, the bargaining agreement, trust agreement,

contract, or other instruments under which the plan is established or operated."  29 U.S.C. §

1024(b)(4) (footnote omitted).  The statute further provides, in relevant part, as follows:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, each violation described . . . with respect to any single participant or beneficiary, shall be treated as a separate violation.

29 U.S.C. § 1132(c)(1).  ERISA defines the term "administrator" as follows:

> The term "administrator" means–
>
> > (i) the person specifically so designated by the terms of the instrument under which the plan is operated;
> >
> > (ii) if an administrator is not so designated, the plan sponsor; or
> >
> > (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

29 U.S.C. § 1002(16)(A).  Where an employee benefit plan is established by a single employer,

the term "plan sponsor" means "the employer."  29 U.S.C. § 1002(16)(B).  Therefore, the "plan

administrator" is the "plan sponsor" unless otherwise specified in the plan.  Caffey v. Unum Life

Ins. Co., 302 F.3d 576, 584 (6th Cir. 2002).  Given the statute's definition of the "plan sponsor,"

in the case of a single employer plan the "plan administrator" is the employer, unless the plan

provides otherwise.

"It is well established that only plan administrators are liable for statutory penalties under

§ 1132(c)."  Caffey, 302 F.3d at 584 (citing Hiney Printing Co. v. Brantner, 243 F.3d 956, 960

(6th Cir. 2001) and VanderKlok v. Provident Life & Accident Ins. Co., 956 F.2d 610, 618 (6th

Cir.1992).  Therefore, the question is whether Principal is an entity who falls under the legal

definition of a  "plan administrator."   Given the controlling statutory definition, resolving this

question requires the court to determine not whether Principal *acted* as a plan administrator, but

rather whether Principal was "so designated by the terms of the instrument under which the plan

is operated" as provided by 29 U.S.C. § 1002(16)(A)(i).

Principal argues that it is not the plan administrator because the "Plan Document"

identifies Northside as the plan administrator within the meaning of ERISA.  The "Plan

Document" to which Principal cites is the Medical Plan – not the life insurance plan.  Although

Principal has provided a copy of the Administrative Services Agreement, this is not a plan

document.

However, Principal has also provided what appears to be a summary plan description

("SPD").  Defendant's Exhibit (doc. nos. 28-9, 28-10).[22]  Because the SPD describes the

benefits available to Northside employees and is written for their benefit, it qualifies as a plan

document, even assuming that it is only a part of a collection of documents which form the plan.

See Pegram v. Herdrich, 530 U.S. 211, 223 (2000) ("the Rules governing collection of

---

[22]The document Principal has provided is a printed version of a Northside employee
benefits website.  The printed version states that the document "provides a summary description
of the benefits available to Northside Hospital employees."  Defendant's Exhibit (doc. nos. 28-9)
at 6.

premiums, definition of benefits, submission of claims, and resolution of disagreements over

entitlement to services are the sorts of provisions that constitute a plan"); Bergt v. Retirement

Plan for Pilots Employed by MarkAir, Inc., 293 F.3d 1139, 1143 (9th Cir. 2002) ("we follow the

other courts that have held that the SPD is part of the ERISA plan") (citations omitted); see also

Heffner v. Blue Cross and Blue Shield of Alabama, Inc., 443 F.3d 1330, 1341 (11th Cir. 2006)

("the summary plan description is not the sum total of an ERISA plan") (citing 29 U.S.C. §

1022(a) and (b)).  Plaintiff does not dispute that he received an "accelerated death benefit" as

described in this document, and he has cited to the document as describing this benefit.

Plaintiff's Response at 3 n.1.  Although the document does indicate that claims and payments are

to be made to Principal, nothing in the pages of the document devoted to life insurance benefits

expressly identifies Principal as a "plan administrator" for those benefits.  Defendant's Exhibit

(doc. no. 28-10) at 14-49.[23]

The burden is on plaintiff to establish that Principal is a "plan administrator" within the

meaning of ERISA.  Therefore, the burden ultimately falls on plaintiff to provide a plan

document for the life insurance plan which names Principal as a plan administrator.  Plaintiff has

not provided such a document.  Moreover, what plaintiff's own evidence does show is that when

he requested a "life insurance policy booklet" from Northside, the hospital's benefits specialist

notified him that Northside "does not have a policy booklet for the life insurance policy."

Plaintiff's Exhibits 3, 4.  Plaintiff has not pointed to any written plan document which

establishes Principal as a plan administrator for Northside's life insurance plan.  Under the

---

[23]An administrator must be designated in the summary plan description.  See 29 U.S.C. §
1022(b) (providing that summary plan description shall contain, among other things, "the name
and address of the administrator").

circumstances, given that plaintiff has not identified any plan document which specifically designates Principal as a plan administrator, the court concludes as a matter of law that the plan administrator is, by default, the "plan sponsor," which is – of course – Northside.  29 U.S.C. § 1132(c); 29 U.S.C. § 1002(16)(B).  Because Principal cannot be considered a  plan administrator under the statutory definitions, it is not liable for statutory penalties.

Plaintiff cites various statutory sections and administrative regulations that describe information an administrator must furnish, and relies on these to argue that Principal's role  is that of a "de facto" plan administrator who may be held liable for failing to supply that information.   Plaintiff also cites to case law from other jurisdictions which – he argues – endorses a "de facto" administrator approach.  However, the Sixth Circuit has not endorsed this approach.  Instead, the Sixth Circuit has recognized that there is a "lack of precedent for expanding the statutory definition of a plan administrator under ERISA."  Hiney Printing, 243 F.3d at 961.

Even if there was non-controlling precedent from other jurisdictions recognizing "de facto" administrators, this court would decline to follow it.[24]  Congress has clearly defined the

---

[24]Other courts have also refused to expand the express statutory definition of "administrator."  See, e.g., Crocco v. Xerox Corp., 137 F.3d 105, 107 (2d Cir.1998) ("we [have] expressly stated our disagreement with decisions of the First and Eleventh Circuits holding employers responsible as de facto administrators under ERISA") (citations omitted); Jones v. UOP, 16 F.3d 141, 145 (7th Cir. 1994) ("If the plan designates an administrator and the sponsor makes no effort to impede participants' access to him, we cannot see what purpose would be served by the imposition of statutory penalties"); McKinsey v. Sentry Ins., 986 F.2d 401, 404 (10th Cir.1993) ("Section 1002(16)(A) provides that if a plan specifically designates a plan administrator, then that individual or entity is the plan administrator for purposes of ERISA. The statutory language is clear and unambiguous, and admits of no other interpretation"); Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 62 (4th Cir. 1992) ("While it is true that an insurer will usually have administrative responsibilities with respect to the review of claims

(continued...)

term "administrator" in 29 U.S.C. § 1002(16)(A).  Assuming that the law permits the existence

of multiple plan administrators, an entity which is not the employer generally cannot qualify as

an "administrator" unless "specifically so designated by the terms of the instrument under which

the plan is operated[.]"  In other words, the designation must be specific, and it must be in

writing.  The facts do not show that either aspect of the definition is satisfied here with respect to

Principal.  In addition, in the event that the written plan documents do not specifically designate

a plan administrator, any statutory duties and resulting liability fall on the employer, Northside,

which is a party in this case.  Therefore, even if plaintiff could show that Principal failed to

respond to a request for information regarding the life insurance plan, Principal has no liability

for statutory penalties here.  Caffey, 302 F.3d at 585.


CONCLUSION

For the reasons stated above, the court grants Principal's motion for summary judgment.

So ordered this 23rd day of June, 2008.



 /s/ Wendell A. Miles
Wendell A. Miles, Senior Judge


---

[24](...continued)
under the policy, that does not give this court license to ignore the statute's definition of plan
administrator");
Davis v. Liberty Mut. Ins. Co., 871 F.2d 1134, 1138 n.5 (D.C. Cir. 1989) ("Respect for our
proper role requires that we decline this invitation to substitute our notions of fairness for the
duties which Congress has specifically articulated by imposing liability on the 'administrator'").